MELLON v. ST. LOUIS UNION TRUST CO. et al.*

(Circuit Court of Appeals, Eighth Circuit. July 7, 1915.)

No. 4402.

1. MECHANICS' LIENS ⬤⇒5—STATUTE CREATING—CONSTRUCTION.

Mechanics' liens, although unknown to the common law, are not for that reason to be strictly construed, but liberally, to carry out the intention of the Legislature to protect workmen, contractors, and materialmen.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. §§ 3, 5; Dec. Dig. ⬤⇒5.]

2. COURTS ⬤⇒366—FEDERAL COURTS—STATE DECISIONS.

In construing a state statute, the federal courts will follow the construction placed thereon by the highest court of the state.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 954–957, 960–968; Dec. Dig. ⬤⇒366.

Conclusiveness of judgment between federal and state courts, see notes to Kansas City, Ft. S. & M. R. Co. v. Morgan, 21 C. C. A. 478; Union & Planters' Bank of Memphis v. City of Memphis, 49 C. C. A. 468; Converse v. Stewart, 118 C. C. A. 215.]

3. MECHANICS' LIENS ⬤⇒184—PROPERTY SUBJECT—INTEREST OF LESSEE—STATUTE.

Under Rev. Laws Okl. 1910, § 3862, providing that, if the title to land is not in the person, with whom a contract for the erection of a building thereon is made, but it is leased and unimproved, a lien shall be allowed on the buildings and improvements separately from the real estate, where unimproved land was leased, the lessee building thereon, the lessor's fee in the premises was not subject to the liens arising under the building contract, since the language of the statute clearly showed that a mechanic's lien, when the realty was leased and unimproved, should be allowed only on the buildings.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. § 323; Dec. Dig. ⬤⇒184.]

4. MECHANICS' LIENS ⬤⇒198—PRIORITIES—LESSOR'S LIEN UNDER LEASE.

Where land was leased, the instrument giving the lessor a first lien on a building to be erected to secure unpaid rents, etc., and the contractors for such building had notice that the party with whom they dealt was merely lessee, and not owner of the land, the lien of the lessor on the building under the lease was superior to the contractors' lien, since, when they contracted to erect the building, they had notice of the lease, and so were chargeable with knowledge of all facts that they might have ascertained by the exercise of reasonable diligence, as by inquiry of the lessor.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. §§ 348–355; Dec. Dig. ⬤⇒198.]

5. MECHANICS' LIENS ⬤⇒216—ESTOPPEL TO CLAIM—EXECUTION OF BOND.

Where contractors for a building to be erected on leased land by the lessee gave bond to the lessor, lessee, and their mortgagee conditioned that they would pay off and discharge any claims against the building and the real estate, and save the parties to whom the bond was given

---

harmless from any claims for material and labor, such contractors were not estopped thereby from claiming a lien on the leasehold and building, since the mere execution of the bond did not waive their potential lien, but only· in effect agreed that Lefore payment could be claimed by them the building should be free of liens.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. §§ 400–402; Dec. Dig. &216.]

6. MORTGAGES &151—PRIORITY OVER LANDLORD'S LIEN.
Where land was leased, the lease providing that the lessor should have a lien upon the building to be erected by the lessee for rents and certain disbursements, of which lease the trust company to which the lessee mortgaged the building to secure funds for its completion had actual notice, the lien of the lessor on the buildings under the lease was entitled to priority over the mortgage debt of the trust company.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 307, 309–311, 314–329, 332–336; Dec. Dig. &151.]

7. MORTGAGES &151—PRIORITY—MECHANICS' LIENS.
Where a trust company, loaning money on mortgage for the completion of a building on leased land, knew that a large amount of work had been done thereon before its mortgage was taken, its mortgage debt was subject to lien claims for the previously performed work.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 307, 309–311, 314–329, 332–336; Dec. Dig. &151.]

8. MORTGAGES &151—PRIORITY—LIEN FOR RENT.
Where a lease, providing for the erection of a building by the lessee, gave the lessor a lien on the lessee's rents from the building for rent due the lessor, such lessor, upon foreclosure of a mortgage against the building, was entitled to rents in the hands of a receiver.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 307, 309–311, 314–329, 332–336; Dec. Dig. &151.]

9. MORTGAGES &146—MORTGAGE LIENS—PROPERTY SUBJECT—RENTS.
A mortgage given on a building erected on leased ground, without providing for a lien on the rents in case of default, gives the mortgagee no lien on the rents produced as against the lessor, who under the lease had a lien on the building and the rent thereof during the term.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 307, 309–311, 314–329, 332–336; Dec. Dig. &146.]

Appeal from the District Court of the United States for the Western District of Oklahoma; John H. Cotteral, Judge.

Action by the St. Louis Union Trust Company against Mary E. Mellon and others. Decree for plaintiff, and the named defendant appeals. Reversed and remanded, with directions.

The appellant, Mary E. Mellon, was the owner in fee simple of two lots in Oklahoma City, Okl. On November 1, 1909, she leased the same to Miss Dora Patterson, one of the defendants and appellees in this cause, but who neither appealed nor filed a brief at the hearing in this court. The lease was for a term of 99 years, for the yearly rental of $6,000, payable in monthly installments of. $500, payable in advance. That rental was to begin on July 1, 1910. For the period between November 1, 1909, and July 1, 1910, she paid the sum of $1,000 as a rental. By the provisions of the lease the lessee obligated herself to pay, in addition to the $500 a month rental, all rates, taxes, general or special, of every nature, levied or imposed on the premises and buildings thereon, the first tax to be paid by her for the year 1910. She also obligated herself to erect, finish, and complete upon the premises a modern building, constructed of brick, concrete, or steel, not less than three stories high in addition to the basement, to cover the lots, except what might be necessary for

&For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes.

light and air. The building was to cost not less than $40,000, and the erection of the building was to be commenced within one year; and the building to be constructed was to be free from all mechanics' liens and free from any and all claims likely to ripen into mechanics' liens. During the demised term no mechanics' liens for improvements should be put upon the demised premises, and in the event liens should be filed thereon the lessee was to pay the same off within 30 days after final judgment, and if she failed to do so the lessor should have the right to pay the same off, and the amounts thus paid should be added to the rent, and if the default in the payment of such sums and the rent continues for three months after they become due, the lessor has the option to declare the lease terminated, and if the forfeiture is on account of any mechanics' liens, the improvements shall also be forfeited without compensation therefor. The lessee also obligated herself to keep the building insured, the loss, if any, to be made payable to the lessor and any mortgagee who may hold a mortgage on the premises for money loaned, for the purpose of rebuilding the premises destroyed either by fire, lightning, or tornado; but in such case the lessee is not required to erect any better building than the one destroyed. If the building is destroyed within 24 months of the termination of the lease, then she need not rebuild, and the insurance money is to be paid to the lessee, except what she may owe to the lessor.

Paragraph 9 provides, among other things, that, should the lessee desire to borrow money upon said real estate and the buildings thereon to pay for the building, the lessor hereby agrees to join the lessee in the execution of a mortgage on said real estate for an amount not to exceed 60 per cent. of the actual cost of said building, provided that said mortgage, as originally negotiated upon said premises, shall not run for a longer period than 10 years; but the lessor hereby agrees, if the said lessee is unable to pay off and discharge said mortgage at the end of said period of 10 years, to consent to a renewal thereof for a period not to exceed 5 years additional after the expiration of said period of 10 years. Paragraph 11 provides for a forfeiture upon noncompliance with certain of the covenants contained in the lease. Paragraph 12 provides that upon the expiration of the term of the lease the lessor will purchase from the lessee the improvements and buildings then remaining on said premises, and will pay to the lessee a sum of money therefor, equivalent to 75 per cent. of the value of said improvements then standing upon said premises. There is also a provision in that paragraph for an appraisement of the improvements at that time, and an arbitration in case the parties cannot agree as to the value, and a further provision that in the event the lessor fails to pay for the improvements, when ascertained, for the period of one year, then the amount due the lessee for the improvements shall be a mortgage on the premises, including the lot and building, for the sum due her. Paragraph 15 provides that in case the lessor shall, without any fault on her part, be made a party to any litigation commenced by or against the lessee, then the lessee shall pay all costs and attorney's fees incurred by or against the lessor in connection with such litigation, and that such costs and attorney's fees, if paid by the lessor, and the rent reserved in the lease, and all taxes and assessments, and the payment of all moneys provided in this lease to be made to the lessor, shall be and they are hereby declared to be a first lien upon all the buildings and improvements placed upon said demised premises at any time during the term of this lease, and upon the leasehold estate hereby created, and upon the rents of all buildings and improvements situated upon said premises at any time during said term.

The lease was duly acknowledged by both parties at the time of the execution and was filed for record in the proper office of the register of deeds on March 21, 1911. On February 14, 1911, Miss Patterson entered into a contract with Campbell & O'Keefe for the erection of a building on the leased premises, whereby she agreed to pay them in installments, as certified by the architects in charge, the sum of $130,000 for all the work and material, and liens or claims for which the contractors were liable were to be deducted as an indemnity against the same. The building contract was the usual one, but contained, among others, the following provisions: "The contractor is to be paid on the 1st and 15th of each month, upon presentation of written certificates for estimates from the architect, 90 per cent. of the amount of

material on the ground and in the building and labor, the final payment to be made within 10 days after the contract was fulfilled."

On April 20, 1911, Miss Patterson arranged with the appellee, the St. Louis Union Trust Company, which will be referred to as the Trust Company, for a loan of $75,000 to be used for the erection of the building contracted for as above set out, and executed a mortgage on that day, in which Mrs. Mellon joined, whereby they conveyed to the Trust Company, as security for the contemplated loan, the fee to the lots, as well as the improvements and buildings to be erected thereon. The mortgage, although signed by both parties, contains a covenant of Miss Patterson that she is the owner of the 99-year leasehold, then of record in the office of the register of deeds of Oklahoma county, and a covenant by Mrs. Mellon that she is the owner in fee simple of the lots, subject to said lease. It also contains the usual covenants against incumbrances. In addition to that the mortgage contained the following clause: "The said Mary E. Mellon, as party of the first part in the within and foregoing mortgage, hereby joins in the execution of said mortgage to secure the indebtedness of Dora Patterson; said indebtedness being contracted for the purpose of enabling the said Dora Patterson to erect the improvements upon said premises described in said mortgage as contemplated by the written 99-year lease made and executed by and between the said Mary E. Mellon, as lessor, and the said Dora Patterson, as lessee, dated November 1, 1909, so that the interest of the said Mary E. Mellon, as owner of said premises, and lessor, as described in said lease, and the interest of the said Dora Patterson, as lessee, being the entire interest, title, and estate, in fee simple absolute, in, to, and upon the real estate described in this mortgage, is hereby mortgaged unto the said second party for the purpose of securing the payment of said indebtedness and each and every part thereof." The notes executed to the Trust Company for this loan were signed by Miss Patterson alone. The mortgage was executed and acknowledged by both mortgagors on April 20, 1911, and filed for record on August 2, 1911.

The proceeds of the loan were not placed by the Trust Company to the credit of Miss Patterson until August 12, 1911, and the first withdrawal of this credit was on September 5, 1911, by a check drawn by Miss Patterson on the Trust Company in favor of the contractors, accompanied by a certificate of the architects that the amount was due the contractors for work done and materials furnished on the building. This check was for $7,681.45. The balance of the deposit, which originally amounted to $72,000, $3,000 having been deducted from the loan by the Trust Company for its commissions, was withdrawn at different times by checks of Miss Patterson, all in favor of the contractors, for work and materials for the building, and upon the certificates of the architects, which were attached to the checks. The last check, which exhausted the $72,000, was paid on March 11, 1912. Before the proceeds of the loan made by the Trust Company under the mortgage had been placed to the credit of Miss Patterson, she had paid to the contractors, Campbell & O'Keefe, on the certificates of the architects, the sum of $44,189.71 out of her own funds as follows:

| | |
|---|---:|
| April 1, 1911 | $ 1,500.00 |
| April 29, 1911 | 7,225.55 |
| May 15, 1911 | 5,000.00 |
| June 1, 1911 | 4,575.92 |
| June 15, 1911 | 4,009.09 |
| July 1, 1911 | 4,009.09 |
| July 15, 1911 | 10,521.66 |
| August 8, 1911 | 7,348.40 |

And the sum of $5,285.48 she paid on August 8th to the architects for their services, making a total of $49,475.19 paid on the building by Miss Patterson before any money was advanced to her by the Trust Company. The receipts for these payments, with the certificates of the architects, were sent to the Trust Company on August 9, 1911, three days before the $72,000 was placed to Miss Patterson's credit. There is no evidence in the record when the work on the building was commenced, except the certificate of the architects, which shows that on April 1, 1911, the contractors were entitled to $1,500 for labor

performed and materials furnished on the building to that date. At the time this certificate was given by the architects the lease had been of record since March 21, 1911, 11 days, 35 days after the contract for the erection of the building had been made, and 4 months prior to the filing of the mortgage to the Trust Company.

On August 24, 1911, the contractors, Campbell & O'Keefe, at the request of Miss Patterson, Mrs. Mellon, and the Trust Company, executed and delivered to them a bond, with the Southern Surety Company as surety, for the sum of $50,000, conditioned that they would pay off and discharge any and all claims against said building and the real estate upon which the building was being erected, and "save and protect the said Mary E. Mellon, Dora Patterson, and the St. Louis Union Trust Company harmless from any claims for material and labor used or performed in and about the construction of said building."

Miss Patterson failing to pay the last installment due the contractors for the erection of the building, which, with the sums due to the subcontractors and materialmen, amounted to $18,154.44, they filed a mechanic's lien on the building in conformity with the laws of the state of Oklahoma. In this claim they included the amount due them, and also the sums due the materialmen and subcontractors, which latter amounted to $12,094.53; their own claim being $6,059.91. This claim did not include all of the architects, who filed a separate lien claim for $1,000, balance due them for their services. In these claims Campbell & O'Keefe and the architects made no claim of a lien on the lots or against Mrs. Mellon, but only on the leasehold and building and against Miss Patterson. Seventeen materialmen and subcontractors, to whom different amounts were due, were included in that lien claim of Campbell & O'Keefe. Most of the subcontractors had also filed separate lien claims, but of all the claims filed only four made a claim of a lien on the real estate as well as the building and leasehold. The parties who made such claims, and the amounts for which they made them, were: The Darling Mill Company, for $997.11; W. J. Pettee & Co., for $352.10; Bradbury Marble Company, $2,742.74; J. B. Klein & Co., $571.29.

The Trust Company purchased all these claims which had been filed as liens, and took an assignment of them. It purchased them at a discount, but at the hearing it only claimed, and was awarded by the decree, the sums of money it actually paid for them with interest thereon. Miss Patterson having defaulted in the payment of interest on the mortgage debt, the Trust Company filed its bill of foreclosure, and by a supplemental bill included the claims of the lien creditors, which it had purchased and of which it was the assignee. While answers were filed by all the defendants, Mrs. Mellon is the only party who appealed from the final decree. It would therefore serve no useful purpose to set out the allegations in any of the answers of the defendants, except that of Mrs. Mellon, and of her answer only so much as is necessary for the determination of the contentions of the appellant as set out in the assignment of errors, and which were presented to the court in the brief and oral argument of her counsel.

In her amended answer she denies that the claims of the contractors or subcontractors, if liens at all, are liens on the fee of her lots; but she insists that, if the contractors and subcontractors are entitled to any liens, they can claim them only on the leasehold and building, and that they are inferior to the liens of herself and the Trust Company. She alleges that the lease made by her specifically provided that the building should be erected free from all mechanics' liens, and free from any and all claims and rights which might ripen into mechanics' liens, and that it further provided, "It is further agreed, and notice is hereby given, that no mechanics' or other liens shall, in any way, manner, or degree, affect the claim of the lessor on such building or attach to her rights in said premises;" that the contractors and all other claimants had full knowledge of the terms of said lease at the time they entered into the contracts for the erection of the building; and that under the laws of Oklahoma such liens, if valid in other respects, can only attach to the building. The answer especially attacks the claim of Campbell & O'Keefe upon several grounds: (a) That the contract for the erection of the building was made by Miss Patterson, without authority from the lessor, and without her

knowledge or consent; *(b)* that said contractors are estopped from claiming any lien as against her by reason of the bond executed by them as hereinbefore stated; *(c)* that Campbell & O'Keefe have violated the provisions of said bond in failing to pay the subcontractors as they had obligated themselves to do. The answer also attacks the validity of the claims of the liens of the several subcontractors and materialmen. She further alleges that there are large sums of money due her from Miss Patterson for rent and attorney's fees paid out in this cause, for which she has a lien by virtue of the provisions of the lease, and that this claim of hers is superior to the mortgage lien of the trust company. For that purpose she filed a cross-bill.

There was a final decree, which provided that the claim of Layton & Smith, the architects, and of the Trust Company, as assignee of the contractors, subcontractors, and materialmen, for the sums paid for them by the Trust Company, with interest thereon, be allowed as liens on the lots and improvements; that the claims of the Trust Company secured by the mortgage, with interest and $3,000 attorney's fee, be allowed as liens; that the claims of Layton & Smith and the contractors are established as a first lien and prior to all other liens upon the real estate and premises described in the decree; that the claim of the Trust Company is established as a valid lien upon the real estate and premises, as a second lien; and that the claim of Mrs. Mellon for rents and $1,500 attorney's fee be established as a third lien, subject to the architects', the contractors', and the Trust Company's mortgage. The decree further provided that, if all claims adjudged to be liens are not paid within six months, the lots, with all the improvements thereon, be sold by the special master appointed by the court, and after paying the costs of the action to pay the amounts due according to the priorities of the liens as established by the decree, and barring the equity of redemption.

The record fails to show the appointment of a receiver for the collection of the rents from the building during the pendency of this action, but the decree recites: "It is further by the court ordered, decreed, and adjudged that M. F. Meadows, the duly appointed and acting receiver herein, be by the court continued in his office as such receiver during the pendency of this action, and until the confirmation of the sale of the real estate had and made under this order and decree, and until the further order of this court," etc. This shows that the premises are in the possession of a receiver appointed in this cause.

From this decree Mrs. Mellon alone appealed.

J. H. Everest, of Oklahoma City, Okl. (R. M. Campbell, of Oklahoma City, Okl., on the brief), for appellant.

W. F. Wilson, of Oklahoma City, Okl. (John Tomerlin and E. E. Buckholts, both of Oklahoma City, Okl., on the brief), for appellee St. Louis Union Trust Co.

Before SANBORN, Circuit Judge, and TRIEBER and REED, District Judges.

TRIEBER, District Judge (after stating the facts as above). Learned counsel for appellant do not question the findings of facts made by the trial court, but challenge the conclusions of law in determining the claims of appellees superior liens to hers, and also declaring the mechanic's lien claims to be liens on the fee of her lots. On behalf of the appellant it is claimed that the contractors and materialmen are not entitled to any liens, but, if they are, they are limited to the leasehold and building, and are inferior to her lien on these for the rent due and other expenditures made by her. She claims that the execution by Campbell & O'Keefe of the bonds estops them from claiming any liens, either for themselves or the subcontractors. It is further claimed for her that, as there are no allegations nor proof that the work on the building was commenced before the execution of the mortgage

to the Trust Company, the liens of the contractors, if they have any, are inferior to those of the Trust Company, as well as hers. On the part of the appellee it is contended, and the District Court so held, that the mechanics' claims are liens on the fee, as well as on the improvements, and are superior to the mortgage lien of the Trust Company, and that reserved by appellant in the lease.

[1-3] Mechanics' liens, being unknown to the common law, are not for that reason to be strictly construed, but should be liberally construed, in order to carry out the intention of the lawmakers to protect workmen, contractors, and materialmen. Hooven-Owens & Rentschler Co. v. John Featherstone's Sons, 111 Fed. 81, 92, 49 C. C. A. 229, 240; Russell v. Hayner, 130 Fed. 90, 64 C. C. A. 424. The liens being statutory, the national courts will follow the construction placed upon the statute by the highest court of the state, if they have been construed by it. It is therefore important, for the determination of the rights of the parties, to look to the Statute of Oklahoma. Section 3862 of the Revised Laws of Oklahoma of 1910 provides:

"Any person who shall, under oral or written contract with the owner of any tract or piece of land, perform labor, or furnish material for the erection, alteration or repair of any building, improvement, or structure thereon; or who shall furnish material or perform labor in putting up any fixtures, machinery in, or attachment to, any such building, structure or improvements; or who shall plant any trees, vines, plants or hedge in or upon such land; or who shall build, alter, repair or furnish labor or material for building, altering, or repairing any fence or footwalk in or upon said land, or any sidewalk in any street abutting such land, shall have a lien upon the whole of said tract or piece of land, the buildings and appurtenances. If the title to the land is not in the person with whom such contract was made, but is leased and unimproved, the liens shall be allowed on the buildings and improvements on such land separately from the real estate. Such liens shall be preferred to all other liens or incumbrances which may attach to or upon such land, buildings or improvements or either of them, subsequent to the commencement of such building, the furnishing or putting up of such fixtures or machinery, the planting of such trees, vines, plants or hedges, the building of such fence, footwalk or sidewalks, or the making of any such repairs or improvements."

This statute has never been construed by the Supreme Court of Oklahoma on the issues involved herein; but the language of the statute clearly shows that the mechanic's lien, when the realty is leased and unimproved, shall be allowed only on the buildings and improvements on such land, separately from the real estate. It was copied in its entirety from the statutes of the state of Kansas. The question involved in this case had not been construed by the Supreme Court of Kansas before its adoption by Oklahoma, but has since been. In Block v. Pearson, 19 Okl. 422, 91 Pac. 714, the Supreme Court of Oklahoma, speaking of the construction of that statute by the Supreme Court of Kansas after its adoption by Oklahoma, said that the construction of this statue by the courts of Kansas was entitled to the highest consideration. The Supreme Court of Kansas has uniformly construed this statute as affecting the interest of the lessee only, and not that of the lessor. In Huff v. Jolly, 41 Kan. 537, 21 Pac. 646, it was held:

"The lien is upon the realty, with the building attached, to the extent of the ownership of the one who contracted for the construction of the building, and no farther; and if there is no ownership, there is no lien."

In Chicago Lumber Co. v. Schweiter, 45 Kan. 207, 25 Pac. 592, and in Getto v. Friend, 46 Kan. 24, 26 Pac. 473, it was held:

"For materials furnished for a building to one who held under an executory contract of purchase, a mechanic's lien is confined to the equity of the purchaser under the executory contract."

To the same effect is Johnson v. Badger Lumber Company, 8 Kan. App. 580, 55 Pac. 517.

Similar statutes in other states have received a like construction by practically all the courts. In Franklin Savings Bank v. Taylor, 131 Ill. 376, 23 N. E. 397, it was held that, where the deed provided that no contract creating a lien should be made, a mechanic's lien could not affect the owner's title. In Dutro v. Wilson, 4 Ohio St. 102, it was held:

"If the ownership is in fee, the lien is upon the fee; if it is of a less estate, the lien is upon such smaller estate [referring to a contract made by one not owning the fee]."

In Forbes v. Mosquito Fleet Yacht Club, 175 Mass. 432, 56 N. E. 615, the lease required the lessee to erect a building on the leased premises, and it was held that the mechanic's lien only applied on the building and leasehold, but not the fee of the lessor. Among the many authorities to the same effect are McCarty v. Burnet, 84 Ind. 27; Benjamin v. Wilson, 34 Minn. 517, 26 N. W. 725; Salzer Lumber Company v. Claflin, 16 N. D. 601, 113 N. W. 1036; Springfield Foundry & Mchy. Co. v. Cole, 130 Mo. 1, 31 S. W. 922; Armstrong Cork Co. v. Merchants' Refrigerating Co., 184 Fed. 199, 107 C. C. A. 93, decided by this court in an action arising under the statutes of Missouri. Many other authorities may be cited to the same effect.

Counsel for the Trust Company cite numerous cases in which the courts have held that a mechanic's lien covers the fee of the lessor, although the contract for the improvements was made by the lessee; but a careful examination of these cases shows that they arose either under statutes which are known as "consent or knowledge" statutes, or the facts upon which the decisions are based materially differ from those in the case at bar.

The later Illinois cases cited are inapplicable, because, as was frankly admitted by counsel in his brief, as well in the oral argument, the statutes of that state, when those cases were decided, were "consent, permission, or knowledge" statutes. The Illinois statute gives a lien on the fee of "any person who shall by any contract with the owner of a lot or tract of land, or with whom such an owner has authorized, or knowingly permitted to improve," etc. The New York statute is also a "consent" statute, and so is the Wisconsin statute. The Wisconsin statute provides that "the lien shall attach to and be a lien on the real property of any person on whose premises such improvements are made, such owner having knowledge thereof and consenting thereto." Section 3314, R. S. Wisconsin. But by a special act of the Legislature of Wisconsin (chapter 466, Laws of 1887) it is provided that the foregoing provision "shall not be construed as giving a lien where the relation of landlord and tenant exists." In Bentley v. Adams, 92 Wis. 386, 66 N. W. 505, these statutes were considered by the court,

and it was held that the special act does not apply to cases where the landowner's contract with the person who constructed a building for him on the land, though coupled with an agreement that such person shall occupy the premises as a tenant for a definite term, and, being unable to pay for the building, surrendered the lease and building to the owner. The ground upon which the court placed its decision is:

"It [the contract between the lessor and lessee] contemplated the construction of a building by the so-called lessee on the land of the so-called lessors for their benefit. They were to become owners of the property. If an owner can free himself from the operation of the lien law by merely making a contract having some of the agreements of a lease, strictly so called, designating the owner of the land as lessor and the contractor who is to build the building as lessee, a very convenient method would exist by means of which such law can effectually be nullified. Chapter 466 was not intended to apply to a case where a person contracts with another to build a building for such person on his land, though coupled with an agreement that such other shall occupy the premises as a tenant of such person."

The court there construed the contract, not as a lease, but as a contract with a so-called lessee to erect the building for the benefit of the owner of the land. This is quite different from the contract in this case.

In Dougherty-Moss Lumber Company v. Churchill, 114 Mo. App. 578, 90 S. W. 405, the improvements, which practically changed the entire building, were to be made at the lessee's expense, but under the "direction and supervision of an architect, chosen by the lessor, whose judgment and decision 'as to what is necessary for the purpose of properly preserving the walls or roof of said premises or support the same, * * * shall be absolute and final upon both parties,'" and upon expiration of the lease the building was to become the property of the owner of the lot without any compensation to the lessee. The court said:

"From the record before us it appears that the lessee was to use the premises for theater purposes alone. In their condition they were unsuited for such use, and when converted into a theater they could be used for nothing else. In effect, the lessor burdened the lessee with the obligation to make and pay for the necessary alterations. That it intended to derive a substantial benefit therefrom is evidenced by the fact that, instead of requiring, at the end of the tenancy, the restoration of the premises in the condition they were in when leased, the improvements were to pass to the landlord. It was to receive a theater for a hotel. Evidently the metamorphosis accomplished at such great expense was for its benefit, as well as that of the termor."

In Dierks & Sons Lumber Co. v. Morris, 170 Mo. App. 212, 156 S. W. 75, and Marty v. Hippodrome Amusement Co., 173 Mo. App. 707, 160 S. W. 26, the leases provided that "all the improvements which the lessee was compelled to place upon the premises, and which changed the building to an extent to make it practically a new building, were to pass to the lessor at the expiration of the lease without any compensation therefor," and it was held that this provision gave the lessor a substantial and present benefit to the freehold.

In some of the other cases cited for appellee the contracts were for a sale and purchase, with conditions that the owner of the fee would advance money to enable the proposed purchaser to erect the improvements, but later these contracts were rescinded, and the prop-

erty, with the improvements, surrendered to and taken possession of by the owner of the fee. Such were the facts in Henderson v. Connelley, 123 Ill. 98, 14 N. E. 1, 5 Am. St. Rep. 490.

In Iron Works v. Taylor, 12 Colo. App. 451, 55 Pac. 942, the lease contained an option to purchase. As a condition of the contract, the proposed purchaser was required to place certain machinery on the premises. This was done, and later the option was forfeited, and the owner of the fee took possession of the property and the machinery, and the court held that the fee was, under those circumstances, subject to the mechanic's lien.

In Whitcomb v. Gans, 90 Ark. 469, 119 S. W. 676, the lease expressly authorized the lessee to make the improvements at the cost of the lessor, to be deducted from the rents. It was held:

"She [the lessor] not only consented to the making of the improvements, but she bound the lessee to do so, and expressly agreed to pay for same by deducting the cost thereof from the rent."

Without reviewing all the authorities cited by the able and diligent counsel for the Trust Company, it is sufficient to state that they have been carefully examined, and the facts found in all the cases cited are practically the same as those reviewed above. In the case at bar there is no option to purchase. The improvements are not to revert to the lessor; but, on the contrary, it is expressly provided that upon the expiration of the lease they are to be bought by the lessor at 75 per cent. of their value, and this sum, when ascertained in the manner provided in the lease, is to be a lien on the lots and improvements in the nature of a mortgage, if not paid by the lessee within one year.

But it is also claimed that the lessor received a present substantial benefit by reason of the high rental, which amounted to at least 15 per cent. per annum on the then value of the lot, which the evidence shows was $40,000, and free from all taxes and expenses. It is a sufficient answer to this contention that the rental value of the lots was a matter between the parties to the lease. If either of them made a bad bargain, the courts cannot make a new contract for them, in the absence of fraud or mistake, and no such claim is made. In fact, neither of the parties to the lease complained of the rental. Aside from that, the fact that at the time this lease was made the value of the lot was only $40,000 does not mean that, in the contemplation of the parties, it would not increase within the 99 years, the life of the lease. It is a well-known fact, of which courts may well take judicial notice, that when a lease for such a long term is made, in a city increasing in population as rapidly as Oklahoma City, and where values of real estate increase so rapidly, those matters are taken into consideration when the lease is for a fixed sum for the full period of 99 years, as is the case here. Some leases for long terms provide for revaluations at certain periods, and the rent to be fixed accordingly. But in this case the parties saw proper to agree on a fixed rental for the 99 years, and, of course, took into consideration the increase of the value of the lots which could be reasonably expected from the experience of the past. If they made a mistake in being too optimistic, the courts are powerless to relieve them by making a new contract

for them. The language of a statute which enables a lessee to improve his lessor out of his premises must be clear and free from ambiguity to justify a court of equity, and for that matter any court, to give it that construction. The statute of Oklahoma, in our opinion, expressly negatives such an intention on the part of the Legislature.

[4] The lien claimants are not entitled to any lien on the fee, but only on the leasehold and the improvements. Are these liens superior to that granted to Mrs. Mellon by the lease? Clearly not. Assuming, without deciding, that the contractors began work before the lease was filed for record, a fact which they failed to establish by proper proof, and even assuming, without deciding, that their rights attached when the contract for the erection of the building was executed, which was before the lease was recorded, they would still not be entitled to priority over Mrs. Mellon's lien reserved in the lease. This provision in the lease is clearly an equitable mortgage. Ketchum v. St. Louis, 101 U. S. 306, 316, 25 L. Ed. 999; Sheffield Furnace Co. v. Witherow, 149 U. S. 574, 578, 13 Sup. Ct. 936, 37 L. Ed. 853; Fourth Street Bank v. Yardley, 165 U. S. 634, 17 Sup. Ct. 439, 41 L. Ed. 855; Walker v. Brown, 165 U. S. 654, 664, 17 Sup. Ct. 453, 41 L. Ed. 865; Connolly v. Bouck, 174 Fed. 312, 98 C. C. A. 184. The contractors, Campbell & O'Keefe, knew at the time they made the contract for the erection of the building that Miss Patterson was not the owner of the lots, but only a lessee of Mrs. Mellon. When they entered into the contract they were chargeable with notice, not only of all matters which they knew, or which were of record, but of all facts which by the exercise of reasonable diligence they could have ascertained. By inquiry of Mrs. Mellon, the lessor, they could have learned the terms of the lease before they entered into the contract. Coder v. McPherson, 152 Fed. 951, 82 C. C. A. 99; 2 Pomeroy's Eq. Jurisprudence (3d Ed.) 597. Failing to exercise reasonable diligence to ascertain that fact, they cannot appeal to the conscience of the chancellor and plead their failure to exercise reasonable diligence as an excuse. Ketchum v. St. Louis, supra.

[5] The claim of the appellant that the contractors are estopped from claiming a lien on the leasehold and building by reason of the execution of the bond cannot be sustained. The authorities cited do not sustain the contention as they are not in point. There was no waiver of the lien by the execution of the bond, but only that, before they can claim payment, the building shall be free from all liens. In Spears v. Lawrence, 10 Wash. 368, 38 Pac. 1049, 45 Am. St. Rep. 789, the surety of the principal contractor claimed a lien on the property while there were still unpaid claims of other subcontractors which were liens, and it was held that, being a surety of the contractor, he could not recover. McHenry v. Knickerbacker, 128 Ind. 77, 27 N. E. 430, Interior Woodwork Co. v. Prasser, 108 Wis. 557, 84 N. W. 833, and Aikens v. Frank, 21 Mont. 192, 53 Pac. 538, like Spears v. Lawrence, are actions by the sureties of the principal contractor.

In the building contract Miss Patterson expressly reserved the right to pay off all lien claims and deduct the amounts thus paid out of the money due the contractors. As she owed the contractors more

than the claims of the subcontractors amounted to, she, or those standing in her shoes, cannot refuse to pay these claims, and also refuse to pay the principal contractors the money due them, and which they would be required to use for paying off all other liens due under the contract. It is her default that is the cause of Campbell & O'Keefe's inability to pay the subcontractors, and one cannot, in a court of equity, plead his own default as a defense. Construing the contract and bond together, it is beyond question that the intention of the parties was that Miss Patterson should not be required to pay any more than was justly due from her under the contract with Campbell & O'Keefe; and that is all that is claimed, as in their lien claim they included all debts which can possibly become liens on the buildings—at least, there is no claim that any other liens are in existence. Whenever the amounts due Campbell & O'Keefe are paid, for themselves and the subcontractors, for whom they would act as trustees, the building will be free from all liens of the contractors, subcontractors, and materialmen, without Miss Patterson, or any other party in interest, being required to pay any greater sum than she is liable for under the contract. In that case the conditions of the bond would be fully satisfied. Harlan v. Texas Fuel & Supply Company (Tex. Civ. App.) 160 S. W. 1142; Pine Bluff Lodge of Elks v. Sanders, 86 Ark. 291, 111 S. W. 255.

[6, 7] Is the debt of the Trust Company secured by the mortgage entitled to priority on the leasehold and building as against the claim of Mrs. Mellon? The Trust Company had actual knowledge of the contents of the lease, which was of record for some time before the execution of the mortgage. This being the case, the mortgage lien of the Trust Company is subject to Mrs. Mellon's lien on the building, except as to the fee to the lots, which will be later determined in this opinion. As between the mechanics' liens and the mortgage lien of the Trust Company, the mechanics' liens are entitled to priority on the leasehold and building. The record shows that on April 1, 1911, the contractors had performed sufficient work on the building to entitle them to $1,500, as certified by the architects. On August 9, 1911, before the mortgage transaction with the Trust Company had been completed, or any of the money loaned paid to Miss Patterson, or even placed to her credit, the Trust Company had knowledge that the building was then in course of construction and that Miss Patterson had paid nearly $50,000 for the work done and materials furnished for the building up to that time. It therefore took the mortgage with notice of the mechanic's lien claims, which entitles those claims to priority on the leasehold and improvements. The amounts due the Trust Company are liens on the leasehold and building, subject to Mrs. Mellon's and the mechanic's lien claims it purchased, and in addition thereto the mortgage claim is a lien on the fee of the lots in case the property has to be sold and the sums realized from a sale of the leasehold and building are insufficient to pay all of the liens. In that event the Trust Company is entitled to have the fee to the lots sold for the balance due it.

[8, 9] The rents in the hands of the receiver should be paid to Mrs. Mellon and credited on her account. Her lease gives her a lien on the

rents for the money due her. The mechanic's lien claimants have no claim on these rents, and make none; nor does the mortgage to the Trust Company give it a lien on the rents. Therefore it has no claim on the rents as against Mrs. Mellon, who, under the terms of the lease, was to have a first lien on the building and "upon the rents of all buildings and improvements upon said premises at any time during said term." Sage v Memphis, etc., R. R. Co., 125 U. S. 361, 8 Sup. Ct. 887, 31 L. Ed. 694, is decisive of this question.

The cause is reversed and remanded, with directions to enter a decree as follows:

After ascertaining the amounts due to Mrs. Mellon and the Trust Company, as assignee of the contractors, and as mortgagee, the liens shall be declared in the following order of priority:

First. The moneys in the hands of the receiver, realized from the rents, after deducting the expense of the receivership, shall be applied to the indebtedness found due Mrs. Mellon, and for the balance, if any, she is to have a first lien on the leasehold and building.

Second. That the Trust Company has a lien on the leasehold and building, subject to that of Mrs. Mellon, for the claims of the contractors assigned to it; the amount to be limited to the sums it paid for them, with interest thereon.

Third. That the Trust Company has a lien on the leasehold and building for the sum due it as mortgagee, subject to the liens hereinbefore stated, and a first lien on the fee of the lots. That unless these sums are paid by a party in interest within a time fixed by the court, the special master shall sell the premises, barring the equity of redemption of all the parties to the action. Upon such sale he shall first sell the leasehold and building; but, if the proceeds of that sale are insufficient to pay all the liens, he shall sell the lots, and if there be any surplus from the sale of the lots, after paying all sums due under the decree, such surplus shall be paid to Mrs. Mellon. In no event shall the lots be sold to satisfy the mechanic's lien claims. In case Mrs. Mellon pays all liens as declared by the decree, she shall become the absolute owner of the lots and building, free from the terms of the lease, and the claims of all parties to this action, and those claiming under them since the institution of this action.

The costs in this court will be taxed against the appellee, the Trust Company. The costs of the court below will be taxed as the District Court may deem equitable.